UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
UNITED STATES,

      Plaintiff,                        MEMORANDUM AND ORDER

  -against-                         Civil Action No.
                                         CV-00-6029 (DGT)
JACOB EVSEROFF, ET AL.,

      Defendants.

-------------------------------X

Trager, J:

On November 7 and 8, 2005, a bench trial was conducted in order to determine facts relevant to three issues: (1) whether Jacob Evseroff ("Evseroff") transferred cash and property to the Jacob R. Evseroff Trust "the Trust" with the intent to hinder, delay or defraud the United States in tax collection in violation of N.Y. Debtor & Creditor Law § 276; (2) whether the transfers of cash and property to the Trust were constructively fraudulent under N.Y. Debtor & Creditor Law § 273; and (3) whether the Trust is a nominee or alter ego for Evseroff.

This case has a long history; some familiarity with the previous opinions is assumed. See United States v. Evseroff (Evseroff I), No. 00-CV-6029, 2001 WL 1571881 (Nov. 6, 2001, E.D.N.Y.) (reducing to judgment the judgment of the U.S. Tax Court); United States v. Evseroff (Evseroff II), No. 00-CV-6029, 2002 WL 1973196 (July 8, 2002, E.D.N.Y.) (allowing Evseroff to

seek expert witness and allowing interest to accrue on default judgment); United States v. Evseroff (Evseroff III), No. 00-CV-6029, 2003 WL 22872522 (Sept. 30, 2003, E.D.N.Y.) (denying plaintiff's summary judgment motion for the claims which were the issue of this trial); see also Evseroff v. United States (Evseroff IV), No. 03-CV-0317, 2004 WL 3127981 (Sept. 22, 2004) (denying Evseroff's claim under the Taxpayers' Bill of Rights).

## Background

### (1)

### Evidence Undisputed at Summary Judgment

Most of the background of the case was presented at summary judgment, was not in dispute then, and was not in dispute at trial. Unless otherwise noted, the facts below are taken from the summary judgment opinion.

Evseroff, a lawyer and former Assistant District Attorney in Kings County, participated in a series of tax shelters between 1978 and 1982 at the recommendation of John Serpico, an attorney and accountant. Evseroff (III), 2003 WL 22872522, at *1; Trial Transcript 32 ("Tr."). Evseroff claims that at the time he believed these shelters to be legitimate. Evseroff (III), 2003 WL 22872522, at *1. There is some basis for supporting his claim; Serpico eventually went to jail for his role with the tax shelters. This issue need not be resolved, however, because it

is immaterial.

In December 1990, after an audit, Evseroff was informed by the Internal Revenue Service ("IRS") that he was deficient in his taxes for that time period. Id. at *1. The notice, dated December 6, 1990, indicated that he owed $211,173 in taxes; including penalties, he owed $227,282. Evseroff Dep. Ex. 1. A few weeks later, in January 1991, he received a more detailed document that included accrued interest, inaccurately estimated by Evseroff as $800,000. Tr. 31. This document was not submitted at trial, but the government did submit, and defendants stipulated to, calculations of the total interest for dates relevant to the case. See Stipulation re Pl's Ex. 10. As of December 6, 1990, the total amount due was actually $647,549.40. Id.

Approximately nine months later in September 19, 1991, Evseroff purchased a retirement property in Florida, which cost $230,000.[1] Evseroff Dep. Ex. 5. This property was later seized by the government. Tr. 188. However, at the time, Evseroff apparently believed that this property could not be seized for

---

[1] At trial, there was some dispute as to the value of Evseroff's Florida residence. Tr. 137-139. The lower amounts Evseroff discussed at trial were clearly the assessed value after certain tax exemptions. The deed shows that he purchased the house for $230,000, which is a better indicator of its sale value. See Evseroff Dep. Ex. 5. The sale value may have reached the $260,000 value that Evseroff relies on in his post-trial brief, but sufficient evidence of this increase was not presented at trial.

3

his tax debt. Id.

On January 9, 1992, the IRS sent Evseroff a notice of deficiency, also known as a "ninety-day letter," which stated that he had accrued more than $700,000 in tax liability. Evseroff Dep. 24, Ex. 3.[2] In the same month, Evseroff, who was 68-years old at the time, met with an attorney, Alfred Polizzotto, Sr., to inquire about creating a trust. Evseroff (III), 2003 WL 22872522, at *1. Evseroff no longer recalls whether this meeting was before or after receiving the ninety-day letter. Evseroff Dep. 93. Two months later, in March 1992, Evseroff filled out a questionnaire, sent by Polizzotto's son, Alfred Polizzotto III, who was actually preparing the trust; Evseroff did not reveal any of his tax difficulties. Evseroff (III), 2003 WL 22872522, at *1.

Shortly thereafter, in April 1992, Evseroff filed a petition with the United States Tax Court, challenging the assertions in the ninety-day letter. Id. at *2. Evseroff did not inform the attorneys setting up the Trust of this petition. Id.

The Trust was executed on June 3, 1992 by Evseroff, naming a family friend the trustee. Evseroff Dep. Ex. 5. In June 1992,

---

[2] Despite the fact that this document is, or at least was at one time, in the government's control, a copy was not submitted. Rather, the evidence of this notice and amount is from Evseroff's deposition testimony and the petition he filed in the Tax Court in 1991. At the time of his deposition on February 2, 2002, he believed the amount was approximately $900,000.

he also deposited $220,000 of his personal funds into the Trust. As of June 1, 1992, Evseroff's total tax liability had accrued to $749,273.65. On October 8, 1992, Evseroff transferred his home at 155 Dover Street, Brooklyn, New York to the Trust. The stipulated amount of Evseroff's tax liability as of October 18, 1992 was $770,530.64.

The Tax Court did not enter the judgment against him until November 4, 1992. The judgment, not including interest, was for $209,113 in taxes and penalties. The remaining, nearly $560,000, is interest.

**(2)**

**Relevant Facts at Trial**

At trial three areas of facts relevant to the issues at hand were developed: (1) Evseroff's intent in establishing the Trust; (2) whether Evseroff was solvent and could repay his debts at the time he established the Trust; and (3) the amount of control Evseroff exerted over the property in the Trust.

**a.   Intent in Establishing the Trust**

Consistently throughout these proceedings, Evseroff has claimed that he established the Trust as part of estate planning associated with his retirement. Evseroff wished to provide for his sons, avoid the estate tax and prevent his wife, from whom he

5

was separated, but not divorced, from receiving a portion of his estate. Evseroff (III), 2003 WL 22872522, at *2. The government has challenged the last point in particular, arguing that Evseroff could have divorced his estranged wife at any time. Evseroff was credible, however, in explaining that he "operated under the theory of let sleeping dogs lie." Tr. 186. Evseroff did not seek to divorce her because at the time he was not supporting her, and if he had asked for a divorce she might have sought a monetary settlement. Id.

The government has also introduced evidence that Evseroff attempted to shield assets from the government's collection efforts by shifting money between accounts (Tr. 72-73), having his sons hold money in lieu of establishing a bank account (Evseroff Dep. 227) and possibly purchasing his Florida residence (Tr. 188). Other than the purchase of the Florida residence, which Evseroff claims was also part of his estate planning, these other transfers occurred long after the Trust was established. However, this later evasion does cast light on his motivations at the time. This history, combined with the proximity in time between the establishment of the Trust and the commencement of the pending tax proceedings, indicate that Evseroff was motivated by the tax proceeding as well in setting up the Trust.

At trial, it became apparent that Evseroff had mixed motives in establishing the Trust: he was concerned about his separated

wife taking a share of his estate, he wished to provide for his two unmarried sons who were living with him and he was concerned about the government's potential collection efforts. All of these motives were present. If the issue were decided today, based on all that happened in the interim, it is clear that his tax problems would be the predominate concern. However, when these events occurred, the separation from his wife and need for estate planning based on this separation was much more at the forefront of his life. The now long-running fight with the IRS, while present, was nascent and not as predominate as it later became.

**b.    Evseroff's Assets at the Time of the Trust**

From June 1992 through the end of October 1992, the time period when Evseroff contributed $220,000 and his Brooklyn home to the Trust, Evseroff's tax liability had reached $770,530.64.

However, Evseroff had many assets. In response to the

government's first interrogatories, Evseroff stated that his
assets, at the beginning of 1992, were:

       Florida Residence       230,000
       Law Practice             75,575[3]
       Pension Account        308,304
       Keogh Account          47,000
       Cash                   577,000

Pl.'s Ex. 6, pp. 5-6. According to this listing ("1992 calculation"), after Evseroff contributed the $220,000 to the trust, the total amount of his assets was $1,017,879. Other than the value of the Florida residences, the government has not challenged these figures, including the cash amount. See Gov't's Proposed Memo. p. 28 and Order, U.S.'s Post-Trial Br. p. 13.

It is unclear whether these listed amounts were the total sum of Evseroff's funds. Evseroff's 1992 Income Tax Forms indicate that he earned $11,006 in interest from six separate bank accounts listed on Schedule B. Evseroff Dep. Ex. 68. These accounts were clearly a form of savings accounts or money market accounts rather than a pension fund. Supposing these accounts accrued 5% interest (the prime rate at the time was 6.5%[4]) then the accounts held approximately $220,000. However, it is unclear whether this estimated amount was part of the $577,000 cash

---

[3] In the interrogatory, the law practice was valued at a higher amount based on "goodwill." Only the accounts receivable and valuation of the corporation calculated by Evseroff's accountant are included here. Pl.'s Ex. 34.

[4] http://www.federalreserve.gov/releases/h15/data/Monthly/H15_PRIME_NA.txt

8

amount Evseroff listed in the 1992 calculation.

The government also submitted a summary of a completely different Citibank bank account with a different account number than those listed in the 1992 calculation above. As the 1992 calculation only included the account numbers for the pension account and the Keogh account, the Citibank account could be another pension account; it could also possibly be one of the Citibank accounts listed on his income tax forms. The evidence does not suggest either. That account, as of January 5, 1993, only three months after the last transfer to the Trust, held $541,767.57. Even though there is no evidence of how much was in his retirement accounts on January 5, 1993, as of February 1994 he still had $317,286.43 in his Citibank pension account. Pl. Ex. 7. Thus it is difficult to accept the government's suggestion at trial that the $541,767.57 were the proceeds of a distribution of a retirement account. This amount, combined with Florida residence and the law practice, indicate that Evseroff had assets of $847,342, which is more than he then owed the government ($770,530.64). If one were to include the estimated amount of $220,000 in the accounts from the interest he claimed in his taxes, Evseroff's assets were worth well over a million dollars.

c. **Evseroff's Control over the Trust Property**

On June 4, 1992, Evseroff signed over his property to the

irrevocable Trust.  Evseroff Dep. Ex. 8.  On October 8, 1992, the same date that Evseroff transferred his Brooklyn home to the trust, Evseroff entered a separate rental agreement with the Trust to allow him to live in the residence.  The agreement had the following conditions:

> That for and in consideration of allowing the Grantor herein to occupy and reside in the aforesaid 155 Dover Street, Brooklyn, New York premises as he may wish, the Grantor herein does hereby agree to pay any and all expenses required to operate and maintain the aforesaid residence dwelling including, but no limited to, taxes, water, sewer charges, utilities, fuel, insurance premiums, repairs, mortgage, etc.  That said monies shall be in lieu of any and all rentals that might otherwise be due and payable.

Evseroff Dep. Ex. 12.  Although Evseroff did not receive any consideration for the house, he did give fair consideration in lieu of rent once he gave the house to the Trust.  All of the maintenance, particularly the mortgage payments, provided valuable consideration to the Trust.

The government introduced evidence that Evseroff had lived in the house and paid the same bills before and after the house was given to the Trust.  However, they have not introduced evidence that Evseroff ever used the money that he gave to the principal of the Trust or that he violated the rent agreement (although during a brief period when his sons helped with some bills).  There was also no evidence that Evseroff tried to act as a true owner by renting to a different tenant, or by selling

the property.

## Discussion

The government has three arguments for why it should be allowed to seize assets from the Trust to help satisfy Evseroff's tax liability: (1) Evseroff committed intentional fraud in setting up the Trust; (2) Evseroff committed constructive fraud; and (3) the Trust is only a nominee of Evseroff.

### (1)

### Intentional or Constructive Fraud

The government has argued that the creation of the trust was either intentional fraud under New York Debtor and Creditor Law § 276,[5] or constructive fraud under New York Debtor and Creditor Law § 273.[6] The government must prove intentional fraud by clear and convincing evidence; it must prove constructive fraud by a preponderance of the evidence. Marine

---

[5] "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debtor & Creditor Law § 276.

[6] "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." N.Y. Debtor & Creditor Law § 273.

11

Midland Bank v. Murkoff, 120 A.D.2d 122, 508 N.Y.S.2d 17, 20 (2nd Dep't 1986) (setting clear and convincing standard for intentional fraud); United States v. Mazzeo, 306 F. Supp. 2d 294 (E.D.N.Y. 2004) (setting clear and convincing standard for intentional fraud); Lippe v. Bairnco Corp., 249 F. Supp. 2d 357, 376 (S.D.N.Y. 2003) (reviewing cases and determining that the preponderance of the evidence standard is appropriate for constructive fraud). As discussed above, there is evidence that Evseroff had mixed motives in establishing the Trust. However, as a threshold issue, it must be determined whether the transfer rendered Evseroff insolvent.

"[I]t is hornbook law that '[a] conveyance cannot be fraudulent as to creditors if the debtor's solvency is not affected thereby, that is, if the conveyance does not deplete or otherwise diminish the value of the assets of the debtor's estate remaining available to creditors.'" Lippe, 249 F. Supp. 2d at 375 (citing 30 N.Y. Jur. 2d Creditors' Rights & Remedies § 305 (2003)). Since there was no consideration for the transfer to the Trust, the burden shifts to Evseroff to show he was solvent after the transfer. Mazzeo, 306 F. Supp. 2d at 306; United States v. Red Stripe, 792 F. Supp. 1338 (E.D.N.Y. 1992).

The culmination of evidence from trial shows that after making the $220,000 to the trust, Evseroff had at least $1,017,879 in assets, including his retirement accounts, after

creating the Trust.  The evidence also shows that Evseroff had an additional Citibank bank account which held $541,767.57 and possibly other accounts, which were listed on his Schedule B. It is unclear whether any of these accounts are duplicates of the total amount Evseroff claimed he had at the beginning of 1992.  Including the Citibank and Schedule B accounts, Evseroff would have had as much as $1,778,646.

The government argues that Evseroff's retirement accounts must be excluded from this calculation because a state creditor could not seize these accounts.  See N.Y. C.P.L.R. § 5205(c). Absent the retirement accounts, the second mystery account, holding $541,767.57 and the accounts listed on his schedule B, Evseroff would not have been solvent after making the $220,000 contribution to the trust.  However, the state law constraints on state creditors who seek to seize retirement accounts do not apply to the IRS.  Once an interest in property is established, federal, rather than state law controls whether the IRS may seize it.  Drye v. United States, 528 U.S. 49, 52 (1999) ("Once it has been determined that state law creates sufficient interests in the taxpayer to satisfy the requirements of the federal tax lien provision, state law is inoperative to prevent the attachment of liens created by federal statutes in favor of the United States.").  The IRS could have placed a levy on these

accounts and seized any distribution.[7]  Given this power, which the state law does not contemplate, it is unlikely that the retirement accounts should be excluded from the solvency calculation.

Even absent consideration of the retirement accounts, no one has established the type of account, or source of the money in the additional Citibank bank account, which contained $541,767.57.  By pointing to this account, together with his Florida residence and law practice, Evseroff has met his minimal burden of production to establish that he was solvent at the time of the transfer.  In any case, the ultimate burden of proof, whether by clear and convincing evidence for the actual fraud, or by a preponderance of the evidence for the constructive fraud, remains with the plaintiff.  The government has failed to meet either burden.  The government, despite being the original source of the evidence of this bank account, has not established whether the money was part of a retirement account, even assuming that the retirement money could not be counted.

At trial the government focused on many other transfers as evidence of fraud.  It did not, however, sufficiently focus on the important issue of Evseroff's solvency at the time of the

---

[7] The government would have been delayed in its collection efforts because it would have had to wait for the distribution.

transfer of his Brooklyn home.  Evseroff himself in depositions and in his testimony at trial was, to put it mildly, obfuscatory.  His bank records, however, were not.  Except for the final, most relevant record, they all showed which accounts were retirement accounts.  After Evseroff presented information that he was solvent, the government had the responsibility to disprove his solvency.  By failing to introduce full information about this account at trial, again assuming it was even needed, the government also failed to meet its burden of proof, not even set at preponderance of the evidence.

Given this failure, the government has not established that Evseroff was insolvent at the time of the transfer to the Trust account.  It cannot, therefore, establish either actual or constructive fraud.

**(2)**

**Nominee/Alter Ego Claim**

As discussed in the summary judgment opinion, the United States, in order to satisfy a tax liability, may "reach every interest in property that a taxpayer might have." Evseroff (III), 2003 WL 22872522, at *9 (quoting United States v. National Bank of Commerce, 472 U.S. 713, 720 (1985)).  In order to determine whether a trust should be pierced under a nominee/alter ego theory, federal district courts in this

15

jurisdiction, looking to state law - albeit in the absence of relevant New York law[8] - apply six non-exclusive factors:

> (1) whether adequate consideration was paid by the transferee; (2) whether there was a close family relationship between the transferor and transferee; (3) whether the transferor continued to enjoy the property after the transfer; (4) whether the transferor retained possession after the transfer; (5) whether the transfer was accomplished in anticipation of a suit against the transferor; and (6) whether the transfer was recorded.

Evseroff (III), 2003 WL 22872522, at *9 (citing First Corporate Sedans, Inc. v. United States, 1996 WL 145958, at *4 (S.D.N.Y. Apr. 1 1999); Giardano, 1997 WL 1038197 (W.D.N.Y. Oct. 29, 1997)).

Most of these factors, which could give rise to an inference of fraud, are explained by Evseroff's estate planning motivations. Indeed, there was no consideration for the establishment of the Trust and the beneficiaries were his sons. Although these factors may indicate that the Trust should be pierced, at trial Evseroff did establish that his estate planning, particularly to avoid leaving money to his separated

---

[8] The New York Court of Appeals has not addressed whether trusts should be pierced under an alter ego theory for the purposes of tax collection. It is not entirely clear that the New York Court of Appeals, applying New York law, would choose to apply the six factor analysis mentioned here. However, the analysis was applied in previous opinions in this case and was relied upon by both parties in their briefs; and accordingly, it will be applied here.

wife, was a major part of his motivation for setting up the Trust and making his sons the beneficiaries. That he was motivated by estate planning is confirmed by the fact that he asked friends of the family to act as trustees. Furthermore, as part of these estate planning concerns, the Trust was, indeed, recorded.

Although Evseroff was also partially motivated by concerns that the government would seize his assets, as discussed above, it does not appear to have been the prime consideration in 1992. Moreover, there is not sufficient evidence indicating that he would have been unable to satisfy his tax liability after the creation of the Trust. Accordingly, the Trust will not be pierced unless Evseroff himself has been inappropriately using it to his benefit. The evidence clearly indicates he has not done so.

The final factors, whether Evseroff continued to enjoy the property and whether he retained possession of it, also could speak to the government's argument that the Trust can be pierced absent evidence of fraud. C.f. Goya Foods Inc. v. Unanue, 233 F.3d 38, 44 (1st Cir. 2000) (setting forth New York state standards for piercing a corporate trust). No further facts have been developed on these points since summary judgment. Evseroff (III), 2003 WL 22872522, at *10-11 (holding that the government's evidence of Evseroff's control of the trust was not

sufficient to grant summary judgment).

Evseroff does live in the house.  However, it is based on a rental agreement with the Trust.  He has provided serious consideration to the Trust by paying the mortgage and other expenses, such as the taxes.  C.f. In re Vebeliunas, 332 F.3d at 89 (piercing trust where donor continued to use property without paying any consideration).  Although the government argues that the trustee has never challenged his use of the house, it is not apparent that Evseroff has violated the rental agreement or acted as a true owner.  Therefore, any such challenge would appear to be baseless.

More importantly, there is absolutely no evidence that Evseroff has used or controlled any of the money given to the Trust.  The government urges that he may in the future, but offers no evidence that he intends to do so.  While the attorney for the government has characterized Evseroff's failure to invade the trust as a cynical step in a long course of conduct, the fact remains that the money has remained in the Trust untouched for fifteen years.

In whole, the government's argument that the Trust is Evseroff's alter ego fails.  The only factor indicating that it should be pierced is that Evseroff was partly motivated by his concerns about tax collection.  The government cites no cases which specifically hold that this factor alone is a sufficient

reason to pierce the Trust.  Moreover, when the Trust was established, Evseroff had estate planning motivations, he apparently had sufficient funds to satisfy the amount owed and, ever since its establishment, he has respected the rental agreement and left the Trust money untouched.  Therefore, the government has failed to establish that the Trust should be pierced and used to satisfy his tax debts.

## Conclusion

For the reasons stated above, the case is dismissed. The Clerk of the Court is directed to enter judgment for the defendant and close the case.

Dated: Brooklyn, New York
September 27, 2006

SO ORDERED:

_____/s/_____
David G. Trager
United States District Judge