UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
UNITED STATES OF AMERICA,

        Plaintiff,

                                  **MEMORANDUM & ORDER**

     - against -

                                  00-CV-06029 (KAM)

JACOB EVSEROFF, ET AL.,

        Defendants.
------------------------------X

**Matsumoto, United States District Judge:**

        This case arises out of efforts by the United States (the

"government") to collect taxes owed by Jacob Evseroff ("Evseroff")

by accessing assets currently held by a trust that Evseroff

established in 1992 for the benefit of his two sons (the "Trust").

The United States argues that Evseroff's attempts to transfer various

pieces of his own property to the Trust should not frustrate the

government's collection efforts under several legal theories.  A

bench trial was held before Judge David G. Trager on November 7 and

8, 2005, and a post-trial order was entered on September 27, 2006

that rejected the government's claims, holding that the Trust

property could not be used to satisfy Evseroff's tax debts (the

"Post-Trial Order").

        The government appealed the Post-Trial Order, and on March

21, 2008, the United States Court of Appeals for the Second Circuit

reversed and remanded.  In its remand order, the Second Circuit

directed the district court to reconsider its findings regarding
whether certain conveyances by Evseroff to the Trust were actually
fraudulent and whether the Trust was Evseroff's alter ego or held
property as his nominee.  For the reasons discussed below, the
government may collect on all property held by the Trust.

## BACKGROUND

This case has been discussed in several prior opinions.
*See United States v. Evseroff*, No. 00-CV-6029, 2001 WL 1571881
(E.D.N.Y. Nov. 6, 2001) (entering judgment on the judgment of the
United States Tax Court regarding Evseroff's tax liability)
("*Evseroff I*"); *United States v. Evseroff*, No. 00-CV-6029, 2002 WL
1973196 (E.D.N.Y. July 8, 2002) (allowing Evseroff to designate an
expert to testify as to the value of his assets and ordering that
interest on Evseroff's tax debts continue to accrue) ("*Evseroff II*");
*United States v. Evseroff*, No. 00-CV-6029, 2003 WL 22872522 (E.D.N.Y.
Sept. 30, 2003) (denying the government's summary judgment motion
on its claim to access the Trust's assets) ("*Evseroff III*"); *Evseroff
v. United States*, No. 03-CV-0317, 2004 WL 3127981 (E.D.N.Y. Sept.
22, 2004) (rejecting Evseroff's claim under the Taxpayer Bill of
Rights) ("*Evseroff IV*"); *United States v. Evseroff*, No. 00-CV-6029,
2006 WL 2792750 (E.D.N.Y. Sept. 27, 2006) (finding, after a bench
trial, that the government could not access assets held by the Trust)
("*Evseroff V*" or the Post-Trial Order).  It is assumed that the

reader has some familiarity with these decisions and, therefore, the relevant facts and procedural history are described only as necessary below.

Evseroff's tax liability arose primarily from his decision to invest in a series of tax shelters between 1978 and 1982 that generated deductions which were later disallowed by the Internal Revenue Service ("IRS"). *Evseroff III*, 2003 WL 22872522, at *1.[1] Evseroff was first notified that he had outstanding tax liabilities in December 1990, when he received a letter from the IRS after being audited. This letter indicated that he owed $227,282 in taxes and penalties. *Evseroff V*, 2006 WL 2792750, at *1. Evseroff received another letter from the IRS in January 1991, and the parties stipulated that, as of December 6, 1990, Evseroff owed $647,549.40 in back taxes and accrued interest. *Id.* In January of 1992, the IRS sent Evseroff a notice of deficiency indicating that he had accrued more than $700,000 in tax liability. *Id.* at *2.

Also in January of 1992, Evseroff met with an attorney to set up the Trust. *Id.* It is unclear whether Evseroff first met with the attorney about the Trust before or after receiving the January 1992 letter from the IRS. *Id.* In April 1992, Evseroff challenged the IRS's calculation of his tax liabilities in a petition to the

---

[1] The IRS also assessed additional liabilities based on Evseroff's 1991, 1992, and 1996 tax returns. *Evseroff III*, 2003 WL 22872522, at *6.

United States Tax Court. *Id.* In June 1992, the Trust was created, with Evseroff's sons as the named beneficiaries. *Evseroff III,* 2003 WL 22872522, at *2. Also in June 1992, Evseroff transferred approximately $220,000 to the Trust ("the $220,000"). *Id.* In October 1992, Evseroff transferred his primary residence, located at 155 Dover Street in Brooklyn ("the Dover Street Residence"), to the Trust. *Id.* In November of 1992, the Tax Court entered judgment against Evseroff in the amount of $209,113 in taxes and penalties and $560,000 in interest. *Evseroff V*, 2006 WL 2792750, at *2.

The particulars of the transfer of the Dover Street Residence are set forth here in detail. Evseroff received no consideration for the deed transferring the Dover Street residence to the Trust. (*See* Deposition of Jacob Evseroff dated February 7 and 21, 2002 ("J. Evseroff Dep."), Ex. 12 (the "Transfer Agreement").)[2] Pursuant to the Transfer Agreement[3], Evseroff was allowed to live in the house and pay the expenses as he had before.

---

[2] All deposition transcripts and exhibits referenced herein were admitted into the trial record, subject to relevance objections. (*See* Transcript of Trial held on November 7 and 8, 2005 ("Tr.") at 86-87.)

[3] The Transfer Agreement also appears to transfer a Florida residence owned by Evseroff to the Trust in October 1992. (*See* J. Evseroff Dep., Ex. 12.) It appears, however, that title to the Florida residence remained with Evseroff, *see Evseroff V*, 2006 WL 2792750, at *3, and thus the transfer of the Florida residence to the Trust apparently never took place. In any case, the status of the Florida residence is not material to the outcome here. The government does not claim that such a residence was fraudulently conveyed. Moreover, if the Florida residence had been conveyed to the Trust, it would only further indicate the weakness of Evseroff's financial condition after the two conveyances at issue here and thereby support the legal conclusions detailed below.

(*Id.*) Evseroff did not pay the Trust any cash rent, but he was responsible for the expenses of the Dover Street Residence, such as the mortgage and taxes on the property. (*Id.*) Moreover, the Transfer Agreement specified no end date after which Evseroff's right to live in the Dover Street Residence expired. (*Id.*) There is no evidence that the Trust assumed Evseroff's mortgage obligations. The Transfer Agreement did not give Evseroff the power to sell the home, *id.*, and Evseroff never attempted to do so, *Evseroff V*, 2006 WL 2792750, at *4. The fair market value of the Dover Street Residence in 1992 was $515,000. (United States ("Gov't") Ex. 6 at 5; ECF No. 190, Defendant's Post-Remand Memorandum of Law ("Evseroff Mem.") at A-1.) In 1995, the payments on the mortgage were $1,044 per month. (ECF No. 186-3, United States' Post-Remand Supplemental Memorandum ("Gov't Mem.") at 3; Evseroff Mem. at A-3.) In 1992, the mortgage was scheduled to be paid off in approximately five years. (Tr. at 91-93; Evseroff Mem. at A-3.)

With respect to the management of the Trust, a series of Evseroff family friends and business associates served as trustees. *Evseroff III*, 2003 WL 22872522, at *9. There is little evidence that they were actively involved in managing the Trust or its assets. Indeed, one trustee appears to have believed that he had no responsibilities until Evseroff's death. (Transcript of Deposition

of Barry Schneider dated January 3, 2002 ("Schneider Dep. Tr.") at 20.) The accounting work for the Trust was performed by Frederick Blumer, an accountant who also performed accounting work for Evseroff and Evseroff's law firm. *Evseroff III*, 2003 WL 22872522, at *3. The accountant was not paid for his work on behalf of the Trust, which he did as a professional courtesy to Evseroff. *Id.* The Trust's tax returns took Blumer between one-half hour and an hour to prepare. (Transcript of Deposition of Frederick Blumer dated February 21, 2002 ("02/21/02 Blumer Dep. Tr.") at 39.) The Trust's tax statements were apparently never even sent to the trustees, and instead were sent directly to Evseroff. *Evseroff III*, 2003 WL 22872522, at *3, *11.

Between 1992 and 1998, the Trust did not record Evseroff's payment of expenses for the Dover Street Residence as income.[4] (02/21/02 Blumer Dep., Exs. 1-7.) The Trust also did not claim the mortgage interest deduction for the Dover Street Residence between those years, though it did claim the deduction for real estate taxes between 1994 and 1998. (*Id.*) Indeed, the Trust never assumed the mortgage for the Dover Street Residence. (Gov't Mem. at 3; Evseroff Mem. at A-2, A-3.) Evseroff also remained the named beneficiary of the flood and fire insurance policies on the Dover Street Residence. (J. Evseroff Dep., Exs. 32-33; Evseroff Mem. at A-7.)

---

[4] The record does not contain information on this point for years after 1998.

Several other facts bear generally on Evseroff's financial affairs. For one, Evseroff had a wife from whom he had been separated for eleven years at the time he created the Trust. *Evseroff III*, 2003 WL 22872522, at *2 n.3. Evseroff would later state that one of his reasons for setting up the Trust was to ensure that his two sons, rather than his estranged wife, received the benefit of his estate. *Id.* at *2. Additionally, he purchased a home in Florida in September of 1991. *Evseroff V*, 2006 WL 2792750, at *2-3. He apparently believed that the Florida home could not be seized by the IRS. *Id.* at *2.

Starting in 1997, Evseroff moved his funds around from place to place and, at one time, had his sons hold money for him rather than establishing a bank account. *Id.* at *3; *Evseroff III*, 2003 WL 22872522, at *5-6. Further, Evseroff admitted that he kept personal funds in his law firm checking account and wrote checks on the account to pay for some personal expenses because he was concerned that the IRS would seize funds from his personal checking account. (Tr. at 72-73, 82-85; *see also* J. Evseroff Dep., Ex. 28.)

Evseroff's financial situation at the time of his transfer of the Dover Street Residence and the $220,000 to the Trust is difficult to discern with precision. Two points, however, are clear: (1) Evseroff was technically solvent after these transfers

despite his tax debts, and (2) Evseroff's readily accessible assets[5] were insufficient to satisfy his tax debt.

First, with regard to Evseroff's solvency, the court found in its Post-Trial Order that on October 18th, 1992 - just ten days after Evseroff transferred the Dover Street Residence to the Trust - Evseroff's tax liabilities totaled $770,530.64. *Evseroff V*, 2006 WL 2792750, at *2-3. Evseroff's total assets, after and excluding the two transfers involving the Dover Street Residence and the $220,000, could be reasonably estimated at anywhere between $847,342[6] to $1,422,646.[7] *See id.* at *3-5. Thus, as of October 18, 1992, he had assets valued somewhere between $76,811 and $652,115 over and above his tax liabilities. *See id.* Regardless of where within that range the value of Evseroff's assets actually fell, the results of the fraudulent transfer, nominee, and alter ego analyses would be the same.

---

[5] For the reasons described below, Evseroff's pension fund and tax assets may not be readily accessible to the United States.

[6] This figure includes $230,000 for Evseroff's Florida residence, $75,575 for his law practice, and $541,767 for a Citibank account, which may be a pension account. *See Evseroff V*, 2006 WL 2792750, at *3-4.

[7] This figure includes $230,000 for Evseroff's Florida residence, $75,575 for his law practice, $308,304 for a Citibank pension account, $47,000 for a Republic Bank Keogh account, an estimated $220,000 in savings accounts or money market accounts, and $541,767 for a different Citibank account, which may have been a pension account. *See Evseroff V*, 2006 WL 2792750, at *3-4. This figure does not include the $577,000 cash amount that Evseroff listed in response to the government's first interrogatories (*see* Gov't Ex. 6, at 5), which may be duplicative of the accounts listed above, s*ee Evseroff V*, 2006 WL 2792750, at *3, *5.

Second, with regard to Evseroff's readily accessible assets, those assets were insufficient to satisfy Evseroff's tax liabilities. In the Post-Trial Order, the court identified two readily accessible assets in Evseroff's possession: his $230,000 Florida residence and his $75,575 law practice. *See id.* at *3-4. The court did not find Evseroff's retirement accounts to be readily accessible because the government could be delayed in its efforts to collect future distributions from the $355,304 in Evseroff's retirement accounts.[8] *Id.* at *5 n.7. In addition, the court heard evidence that Evseroff moved his cash assets from one account to another and hid them in his law practice checking account, with his sons, and in his sons' businesses in an effort to prevent the United States from collecting his cash assets. *Evseroff V*, 2006 WL 2792750, at *3; (*see* Tr. at 72-73, 82-85; J. Evseroff Dep., Ex. 28; 02/21/02 Blumer Dep., Ex. 19). Thus, considering only Evseroff's readily accessible assets, the law practice and the Florida residence, those assets would be worth considerably less than Evseroff's tax debt. The value of Evseroff's law practice and Florida Residence totaled

---

[8] As of the beginning of 1992, Evseroff's retirement accounts consisted of a Citibank pension account valued at $308,304 and a Republic Bank Keogh account valued at $47,000. *See Evseroff V*, 2006 WL 2792750, at *3. Neither party has established whether the Citibank account containing $541,767 was a retirement account or another type of account, and thus whether it was readily accessible. *Id.* at *6.

a mere $305,575, which was almost $465,000 less than his tax debt.
*See Evseroff V*, 2006 WL 2792750, at *3.

At the bench trial held before The Honorable David G.
Trager on November 7 and 8, 2005, the government pressed three
theories for recovering assets from the Trust: (1) that Evseroff
transferred assets to the Trust through constructively fraudulent
conveyances; (2) that Evseroff transferred assets to the Trust
through actually fraudulent conveyances; and (3) that the Trust was
Evseroff's alter ego/nominee. *Id.* at *4-7.

Evseroff claimed that his motivation in setting up the
Trust was estate planning. *Id.* at *2. At the time that Evseroff
started the process of setting up the Trust, he was 68 years old and
had a wife from whom he had been separated. *Id.* at *2-3. He
testified that he set up the Trust so that (1) his sons would get
the benefit of his estate, (2) his estranged wife would not receive
a portion of his assets, and (3) he could avoid the estate tax. *Id.*
at *2. The government, by contrast, argued that his motive in
setting up the Trust was to avoid his outstanding tax debts.

In the Post-Trial Order, Judge Trager noted that
Evseroff's motives were mixed, specifically that:

> At trial, it became apparent that Evseroff had
> mixed motives in establishing the Trust: he
> was concerned about his separated wife taking
> a share of his estate, he wished to provide for

> his two unmarried sons who were living with him
> and he was concerned about the government's
> potential collection efforts. All of these
> motives were present. If the issue were
> decided today, based on all that happened in the
> interim, it is clear that his tax problems would
> be the predominate concern. However, when
> these events occurred, the separation from his
> wife and need for estate planning based on this
> separation was much more at the forefront of his
> life.

*Id.* at *3. With respect to the government's legal arguments, the

Post-Trial Order found that the property transfers to the Trust were

neither constructively nor actually fraudulent, based primarily on

the fact that Evseroff was still solvent, despite his tax debts, after

transferring both the Dover Street Residence and the $220,000 to the

Trust. *Id.* at *5-6. The Post-Trial Order also rejected the

government's claim that the Trust was either Evseroff's alter ego

or that it held property as his nominee. *Id.* at *6-7. With respect

to the latter two findings, the Post-Trial Order reasoned that

Evseroff's creation of the Trust was not primarily motivated by his

desire to avoid the government's collection efforts. *Id.* at *7.

The Post-Trial Order also noted that there was no evidence that

Evseroff had used or controlled any of the money in the Trust, *id.*,

and that he was solvent at the time of the transfers, *id.* at *6.

Finally, the Post-Trial Order discussed the fact that Evseroff

provided valuable consideration to the Trust in exchange for the use

of the Dover Street Residence in that he paid the mortgage and other expenses related to the property. *Id.* at *7.

The government appealed and the Second Circuit reversed and remanded by summary order. *United States v. Evseroff*, 270 F. App'x 75 (2d Cir. 2008) (summary order).[9] Regarding the actual fraud finding, the Second Circuit held that a finding that the transfers did not leave Evseroff insolvent did not preclude a finding that the transfers constituted actually fraudulent conveyances. *Id.* at 77. On remand, the Second Circuit directed the district court to consider both whether Evseroff intended to defraud the government and also whether he intended to hinder or delay its collection efforts. *Id.*

In analyzing the alter ego and nominee issues, the Second Circuit instructed that "the critical issue in resolving a nominee or alter ego claim is not motive, but control." *Id.* The Second Circuit further noted that, if Evseroff controlled the trust, this court should then determine "whether Evseroff used this control to commit fraud or other wrongful conduct, such as whether he ever used the trust for his benefit rather than the benefit of his two sons." *Id.* at 78. In order to determine whether Evseroff used control of the Trust to commit wrongful conduct, the Second Circuit suggested

---

[9] The government appealed only the actual fraud and nominee/alter ego findings; it did not appeal the constructive fraud finding. *Evseroff*, 270 F. App'x at 77.

that this court consider factors such as (1) how the payments made by Evseroff for the Dover Street Residence's expenses compared to the value of the house, and (2) how the payments were treated by the relevant entities for accounting and tax purposes. *Id.*

## DISCUSSION

### I.        Fraudulent Conveyance

On remand, the government argues that Evseroff's transfers of the Dover Street Residence and the $220,000 to the Trust represent fraudulent conveyances under a theory of actual fraud. Under New York law, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276. As this section indicates, a conveyance may be fraudulent whether a debtor intends to actually "defraud" a creditor or merely intends to "hinder or delay" their collection efforts.

"The requisite intent required by this section need not be proven by direct evidence, but may be inferred from the circumstances surrounding the allegedly fraudulent transfer." *Steinberg v. Levine*, 774 N.Y.S.2d 810, 810 (N.Y. App. Div. 2d Dep't 2004) (citation omitted); *see also Capital Distributions Servs., Ltd. v. Ducor Exp. Airlines, Inc.*, 440 F. Supp. 2d 195, 204 (E.D.N.Y.

2006) (citing *Steinberg*). Whether a conveyance is fraudulent "is ordinarily a question of fact," *Grumman Aerospace Corp. v. Rice*, 605 N.Y.S.2d 305, 307 (N.Y. App. Div. 2d Dep't 1993), and a creditor must prove his case by "clear and convincing evidence." *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 374 (S.D.N.Y. 2003) (quoting *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995)).

In determining whether Evseroff had the requisite fraudulent intent, it is necessary to examine a series of factors that are generally referred to as "badges of fraud." *Capital Distributions Servs.*, 440 F. Supp. 2d at 205 (quoting *Steinberg*, 774 N.Y.S.2d at 810).

> These badges of fraud include lack or inadequacy of consideration, family, friendship, or close associate relationship between transferor and transferee, the debtor's retention of possession, benefit, or use of the property in question, the existence of a pattern or series of transactions or course of conduct after the incurring of debt, and the transferor's knowledge of the creditor's claim and the inability to pay it . . . .

*Steinberg*, 774 N.Y.S.2d at 810 (citations omitted). A court may also consider "the financial condition of the party sought to be charged both before and after the transaction in question . . . . [and the] shifting of assets by the debtor to a corporation wholly controlled by him . . . ." *In re Kaiser*, 722 F.2d 1574, 1582-83 (2d Cir. 1983) (citations omitted).

Based on the clear and convincing evidence in the record, factual findings in the Post-Trial Order establish that both conveyances at issue were actually fraudulent. As noted above, the Post-Trial Order found that Evseroff's motives for creating the Trust were mixed: he was concerned with estate planning and with avoiding collection by the IRS and a claim by his estranged wife. *Evseroff V*, 2006 WL 2792750, at *3. The Post-Trial Order also found that Evseroff did not receive consideration for the transfer of $220,000 of personal funds to the trust. *Evseroff V*, 2006 WL 2792750, at *2, *5. Nor did he receive consideration for the transfer of the Dover Street Residence other than a rental agreement with the Trust allowing him to reside in the home in exchange for his payment of operating and maintenance expenses in lieu of rent. *Id.* at *4. Further, the court found that Evseroff was solvent after the transfers. *Id.* at *6. Nothing has been presented that contradicts these findings.

Nevertheless, neither the fact that Evseroff had mixed motives in establishing the Trust nor the fact that he was solvent after he made the transfers absolves him of liability. The primary issue is his intent – not his actual financial status. *See* N.Y. Debt. & Cred. Law § 276; *see also Grumman Aerospace Corp.*, 605 N.Y.S.2d at 307 (finding that a cause of action predicated upon § 276 "may

lie even where fair consideration was paid and where the debtor remains solvent"). Although there must be some actual financial harm to a creditor to support a fraudulent conveyance finding, a debtor need merely "deplete or otherwise diminish the value of the assets of the debtor's estate remaining available to creditors" to be liable. *Lippe*, 249 F. Supp. 2d at 375 (citations omitted).

By making the transfers of the Dover Street Residence and the $220,000 to the Trust, Evseroff unambiguously caused the requisite actual harm to his creditors by reducing the assets he had available to satisfy his tax debt and reducing the value of his readily accessible assets well below the amount of his tax debt. As noted above, at the time of the conveyances, Evseroff's tax liabilities totaled $770,530.64. *See Evseroff V*, 2006 WL 2792750, at *3. As discussed previously, Evseroff's total assets after and excluding the two transfers could reasonably be estimated at anywhere from $847,342 to $1,422,646 - leaving him somewhere between $76,811 and $652,115 over and above his tax debts if all of his assets are included. As such, the IRS would have had to collect somewhere between half and ninety percent of Evseroff's total assets in order to satisfy his tax debts. This would be a difficult task - particularly given evidence in the record that Evseroff was not

inclined to cooperate with collection efforts.[10]  And if one includes

only Evseroff's readily accessible assets, the transfers reduced the

value of Evseroff's remaining assets to $305,575 - well below the

amount of his tax liability.  At the very least, the transfers made

collection efforts much more difficult.

Moreover, Evseroff's financial picture was even less

favorable than the snapshot of the amount he owed the IRS in 1992

would suggest.  That federal tax debt was not the only potential

demand on his assets.  Evseroff was sixty-eight at the time he

created the Trust, and, as he testified at trial, he was getting ready

---

[10] The government argues that Evseroff's pension funds should be
excluded from the calculation of his assets because they were, at the very least,
more difficult to collect.  It is true that pension funds receive substantial
protection from creditors under state law.  *Cf. Pauk v. Pauk*, 648 N.Y.S.2d 134,
135 (N.Y. App. Div. 2d Dep't 1996); 31 Am. Jur. 2d Exemptions § 198 (2009).  There
is little impediment, however, to the immediate collection of pension funds by
the IRS.  The IRS has broad powers to access a taxpayer's assets notwithstanding
protections available for pension funds under state law.  *See* 26 U.S.C.
§ 6334(a),(c) (1992) (noting that "[n]otwithstanding any other law of the United
States . . . no property or rights to property shall be exempt from levy other
than the property specifically made exempt by subsection (a)," which does not
exempt retirement accounts like Evseroff's).  Moreover, "[s]tate law define[s]
the nature of the taxpayer's interest in the property, but the state-law
consequences of that definition are of no concern to the operation of the federal
tax law."  *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 723 (1985)
(holding that state laws governing creditors' rights did not impair the IRS's levy
power); *see also Jacobs v. IRS (In re Jacobs)*, 147 B.R. 106, 108-09 (Bankr. W.D.
Pa. 1992) (holding that the IRS could levy on a pension fund protected from
creditors under state law).  Indeed, the IRS can levy upon and force the immediate
liquidation of an IRA where the taxpayer can withdraw his funds.  *Kane v. Capital
Guardian Trust Co.*, 145 F.3d 1218, 1221-24 (10th Cir. 1998) (noting that the IRS
stands in the shoes of the taxpayer for levy purposes (citations omitted)).  As
Evseroff apparently had the ability to withdraw and use his pension funds (*see*
Tr. at 96-97), the government likely could have accessed the funds as well.
Accordingly, the pension funds should not be categorically excluded from
consideration in Evseroff's asset total.  Furthermore, even if the IRS were unable
to collect from Evseroff's pension funds, it would not affect the result reached
here.

to retire. (Tr. at 38-39, 187-88.) Although Evseroff's assets exceeded his tax liability, his assets were not so substantial as to guarantee that he would not outlive them. Moreover, Evseroff's IRS debt would continue to accrue interest to the extent that he did not pay it down. Evseroff was also aware that he might need to make payments to his estranged wife should they divorce, and he wished to provide as substantial an inheritance as possible to his two sons. These probable demands on his assets, combined with his tax debt, exceeded the assets he had available after the transfers.

Evseroff was well aware of his financial difficulties, including his tax liabilities, when he transferred the assets to the Trust. In December 1990 - more than a year before he first met with his attorney to set up the Trust - Evseroff received an IRS estimate that he owed $227,282, not including interest. *Evseroff V*, 2006 WL 2792750, at *1. Just a few weeks later, in January 1991, he received another letter from the IRS reflecting a total liability that he inaccurately estimated at $800,000. *Id.* In January 1992, he received an IRS letter indicating that he had a liability of more than $700,000. *Id.* at *2. Although it is not clear whether Evseroff had received the January 1992 letter at the time that he first met with an attorney to establish the Trust, he had received the January 1991 letter. Moreover, Evseroff certainly had received the January

1992 letter at the time that he actually conveyed the $220,000 in cash and the Dover Street Residence to the Trust in June and October of 1992 respectively.  The other demands on his assets - such as his family obligations - were also undoubtedly apparent to him at that time.  It is therefore reasonable to conclude that Evseroff knew that he was jeopardizing his ability to pay his taxes when he conveyed the Dover Street Residence and the $220,000 to the Trust.[11]

---

[11]  Evseroff argues in his post-remand submission that he was acting in good faith because he believed that the IRS had accepted his offer to settle his tax liabilities for approximately $110,000 in 1993 (the "initial offer in compromise").  *See Evseroff IV*, 2004 WL 3127981, at *1; (Evseroff Mem. at 5, 21-22.)  The evidence of this purported settlement, however, was not admitted at trial and will not be considered except as discussed here.

Prior to trial, the government indicated that it could prove that this alleged settlement was fraudulent and, indeed, had done so in another action. *See Evseroff IV*, 2004 WL 3127981, at * 1; *see also Evseroff III*, 2003 WL 22872522, at *4.  The government also represented that it had evidence of a series of other offers in compromise that Evseroff submitted.  (*See* Tr. at 24-26.)  The government argued that these other offers were in bad faith and designed to delay collection efforts.  (*See id.*)  Evidence of these other offers in compromise would, however, have been extremely time-consuming to present.

In a pre-trial evidentiary ruling, the court held that Evseroff could not introduce evidence of the initial offer in compromise unless the government introduced evidence of the other offers in compromise.  (*See* Tr. at 23-26, 193-94.)  As the government never sought to introduce evidence regarding the other offers in compromise, the door was not opened to Evseroff to present evidence regarding the initial offer in compromise.

In addition to the evidence of Evseroff's financial situation, evidence of Evseroff's conduct at the time he made the transfers further supports a finding that he intended to hinder or delay collection of his assets, particularly his tax debt.  For one, he engaged in a "pattern or series of transactions or course of conduct after the incurring of debt" that establish his intent to impair, handle, or delay the IRS's ability to collect his tax debts when he made the relevant conveyances.  *Steinberg*, 774 N.Y.S.2d at 810.  Around the time that Evseroff established the Trust in 1992, he purchased a Florida home that he appears to have thought could not be seized by the IRS.  *Evseroff V*, 2006 WL 2792750, at *2.  Five years thereafter, in 1997, Evseroff also moved his funds from place to place and, on one occasion, had his son hold money for him rather than establishing a bank account.  *Id.* at *3; *Evseroff III*, 2003 WL 22872522, at *5-6.  Although these suspicious movements of funds did not occur until 1997 - about five years after Evseroff transferred

---

Evseroff claims that the door was opened to the evidence of the initial offer in compromise because the government relied on evidence regarding Evseroff's actions after the transfers to the Trust.  The evidentiary ruling, however, did not specify that this sort of evidence would open the door to evidence regarding the offer in compromise.  Moreover, post-transfer evidence is commonly and properly offered as evidence of intent in fraudulent conveyance cases.  *Cf. Steinberg*, 774 N.Y.S.2d at 810 (noting that a debtor's retention of control after the legal transfer of the property supports a finding of an actually fraudulent conveyance).  Even apart from the evidentiary ruling, the government's post-transfer evidence would not open the door to the offer in compromise evidence Evseroff wishes to present and it will not be considered.  By contrast, the court will consider the government's evidence of Evseroff's post-transfer actions to the extent it is relevant to Evseroff's intent.

the Dover Street Residence and the $220,000 to the Trust - they nonetheless shed light on Evseroff's general intent in conveying assets to the Trust because they show additional attempts to avoid paying a known tax debt.

These monetary transactions in 1997 are particularly significant because the IRS could only collect his assets to the extent that it could find them. Much of Evseroff's net worth consisted of cash. If the IRS could only reliably collect on Evseroff's readily accessible assets, it would only have access to $305,575 - almost $465,000 less than his tax debt in 1992. Thus, Evseroff's movement of cash assets to avoid collection in combination with his earlier conveyances of the $220,000 and the Dover Street Residence made collection efforts much more difficult.

Finally, Evseroff's intent to shield his assets from the IRS's collection is demonstrated by the fact that he retained the benefits of ownership of the Dover Street Residence after he transferred it to the Trust for no consideration. As noted above, Evseroff continued to live in the residence after the transfer. Evseroff argues that he was, in fact, renting the residence from the Trust, as evidenced by the Transfer Agreement that obligated him to pay certain expenses in lieu of rent, (Evseroff Mem. at 4; J. Evseroff Dep., Ex. 12), and that his ability to live in the house was limited

by the fact that the trustees had the power to sell the house at any time, (Evseroff Mem. at A-2). But neither of these arguments is persuasive.

As discussed *infra* Part II, Evseroff's post-transfer payment of the mortgage and other expenses related to the property in lieu of rent were the type of payments that an owner of property would make, not those that a renter would make. Additionally, although the trustees nominally had the power to remove Evseroff from the Dover Street Residence, there was no evidence that they would actually utilize that power because, as discussed more fully *infra* Part III, Evseroff dominated the Trust to such a degree that it was not a bona fide entity, but merely an extension of Evseroff. Among other things, the trustees were his friends and business associates, and at least one trustee was unaware of any duties he had as a trustee. (Schneider Dep. Tr. at 19-20.) Although the Trust could have removed Evseroff from the Dover Street Residence, as a practical matter, Evseroff's enjoyment of the residence was secure, allowing him to enjoy use and occupancy of the Dover Street Residence as an owner would, given the lack of evidence that either Evseroff or the Trust ever tried to rent or sell the property. *See Evseroff V*, 2006 WL 2792750, at *4.

Evseroff's *de facto* ownership of the Dover Street
Residence is further demonstrated by the fact that Evseroff received
no consideration for transferring the Dover Street Residence to the
Trust.  (J. Evseroff Dep., Ex. 12.)  The lack of consideration to
Evseroff indicates that Evseroff was not relinquishing any rights
to the property in exchange for which he would be paid.  And because
his sons were the beneficiaries of the Trust, the transfer allowed
Evseroff to ensure that they would receive the Dover Street Residence
upon his passing, as they would have had he remained the owner of
the property.[12]

Evseroff responds that his true intention was not to avoid
paying his taxes to the United States, but rather to engage in estate
planning - primarily by ensuring that his assets passed to his two
sons rather than to his estranged wife on his passing.  The
Post-Trial Order found that Evseroff's estate planning motive was
but one of his motives in addition to protecting the assets from the
IRS and his estranged wife at the time that he created the Trust,
*Evseroff V*, 2006 WL 2792750, at *3, and there is no reason to question
that finding.  Nonetheless, even if Evseroff was motivated to create
the Trust, in part, by his desire to provide an inheritance for his

---

[12] Although Evseroff's transfer of the Dover Street Residence does not
bear directly on the $220,000 transfer, the fact that the two transfers were made
at around the same time indicates that Evseroff's intent regarding the $220,000
transfer was the same as that regarding the Dover Street Residence.

sons and shield his assets from his wife, his intent to evade the
IRS's collection effort was substantial and sufficient on its own.
Evidence in the record, as discussed above, demonstrates Evseroff's
intent to shield his assets specifically from the government's
collection efforts. Moreover, the IRS was seeking to collect much
more than Evseroff's wife was likely to obtain in a divorce settlement
as she did not seek a settlement during the years of their separation.
Thus, Evseroff's intent to evade, hinder, delay, and frustrate the
IRS's collection efforts was sufficient to cause him to transfer the
assets to the Trust, regardless of any additional motive that he might
have had. Accordingly, Evseroff's transfer of the Dover Street
Residence and the $220,000 to the Trust was fraudulent as provided
by New York Debtor and Creditor Law § 276. *See Capital Distributions
Servs.*, 440 F. Supp. 2d at 204 (noting that the remedy for a fraudulent
conveyance is that the creditor may collect upon the fraudulently
conveyed property).[13]

## II.        **Nominee**

The government also argues that it should also be able to
collect upon the Dover Street Residence and the $220,000 because
Evseroff is the real owner of both. Though both assets are legally

---

[13] If these assets have been damaged or disbursed, a money judgment
may also be available. *Capital Distributions Servs.*, 440 F. Supp. 2d at 204
(citations omitted). Additionally, the creditor is generally entitled to recover
reasonable attorney's fees. *Id.* (citing N.Y. Debt. & Cred. Law. § 276-a).

held by the Trust, the government argues that the Trust merely holds them as Evseroff's nominee.[14]  "Under the nominee doctrine, an owner of property may be considered a mere 'nominee' and thus may be considered to hold only bare legal title to the property."  *United States v. Snyder*, 233 F. Supp. 2d 293, 296 (D. Conn. 2002).

> The nominee theory focuses
>
> on the relationship between the taxpayer and the property . . . to discern whether a taxpayer has engaged in a sort of legal fiction, for federal tax purposes, by placing legal title to property in the hands of another while, in actuality, retaining all or some of the benefits of being the true owner.

*Richards v. United States (In re Richards)*, 231 B.R. 571, 578 (E.D. Pa. 1999).  As distinct from the government's claim that Evseroff's conveyances were actually fraudulent, a nominee finding can be made even where there was no intent to defraud creditors or hinder collection efforts.  *In re Richards*, 231 B.R. at 579-80 (finding that a trust held assets as a taxpayer's nominee even when the conveyance of the property to the trust was not fraudulent).  Rather than intent, the nominee theory focuses on control.  *Id.*

---

[14] The nominee and alter ego issues have generally been discussed together in the prior opinions and filings in this case.  As discussed later in this decision, however, there are relevant analytical differences between the two theories.

The nominee theory also differs from the alter ego theory in that the nominee theory focuses on the taxpayer's control over and benefit from the *property* while the alter ego theory emphasizes the taxpayer's control over the *entity* that holds the property.[15] *Compare In re Richards*, 231 B.R. at 579 (discussing the nominee theory and noting that "the critical consideration is whether the taxpayer exercised active or substantial control over the property"), *and United States v. Stonier*, No. 88 N 993, 1994 WL 395644, at *4 (D. Colo. Feb. 28, 1994) (listing five factors for making a nominee determination, three of which relate to the transferor's control over or benefit from the property), *with Babitt v. Vebeliunas (In re Vebeliunas)*, 332 F.3d 85, 91-92 (2d Cir. 2003) (discussing the alter ego theory and noting that an individual must control the corporation for alter ego liability to attach); *and Dean v. United States*, 987 F. Supp. 1160, 1166 (W.D. Mo. 1997) (collecting cases and stating that "the common thrust . . . is that the alter ego doctrine will apply when the delinquent taxpayer is really in control of the corporation or trust and so dominates it that the corporate or trust form exists, but there is no substance to it").

---

[15] Although some authority discerns little practical difference between the nominee and alter ego theories, *see United States v. Engels*, No. C98-2096, 2001 WL 1346652, at *6 (N.D. Iowa. Sept. 24, 2001), for reasons discussed below, the differences between the nominee and alter ego theories are relevant in this case.

Where a nominee relationship is found, the government may access only the property held on the taxpayer's behalf by the nominee, not all property of the nominee. *See In re Richards*, 231 B.R. at 580; *see also Giardino v. United States*, No. 96-CV-6348T, 1997 WL 1038197, at *2 (W.D.N.Y. Oct. 29, 1997) ("[T]he government has the authority to seize or levy *on the property of the taxpayer* held by the nominee in order to collect the tax liabilities of the taxpayer." (emphasis added) (citations omitted)).

In determining whether a taxpayer's property is held by a nominee, courts examine:

> (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.

*Giardino*, 191libu97 WL 1038197, at *2 (citation omitted); *LiButti v. United States*, 968 F. Supp. 71, 76 (N.D.N.Y 1997); *see also In re Richards*, 231 B.R. at 579 (considering these factors as well as whether the transferor spent personal funds maintaining the property). As noted above, "the critical consideration is whether the taxpayer exercised active or substantial control over the

property." *In re Richards*, 231 B.R. at 579 (citation omitted). The government bears the burden of proving that the taxpayer's property is held by a nominee.[16]

In the instant case, the Trust held the Dover Street Residence, but not the $220,000, as Evseroff's nominee. Turning first to the Dover Street Residence, an examination of the factors listed above demonstrates that the Trust was Evseroff's nominee. Considering the first factor, the Trust paid no consideration to Evseroff for the property. (J. Evseroff Dep., Ex. 12.) Evidence in the record indicates that the second factor is satisfied in that the Trust was created and the property was transferred in anticipation of Evseroff's liability to the IRS and possibly his estranged wife, and Evseroff remained in possession and control of the Dover Street Residence. The third factor is also satisfied in that Evseroff had a close relationship with the trustees, having selected close friends and associates to manage the Trust. *Evseroff III*, 2003 WL 22872522, at *9.

---

[16] The parties dispute whether the government must prove that the Trust is held by Evseroff's nominee by a preponderance of the evidence or clear and convincing evidence. Because I find that the government's proof satisfies either standard with regard to the Dover Street residence and fails to satisfy either standard with regard to the $220,000, I need not resolve this dispute.

As for the fifth and sixth factors, there is substantial evidence in the record that Evseroff retained and enjoyed possession and control of the Dover Street Residence, even after title was legally transferred to the Trust. Despite the transfer, Evseroff retained possession of the Dover Street Residence and benefitted from it as though he were an owner: he continued to live in the Dover Street Residence without paying rent although he continued to pay the mortgage and other expenses necessary to operate and maintain the property, including taxes, water, sewer charges, utilities, fuel, and insurance (J. Evseroff Dep., Ex. 12); he remained the named beneficiary of the flood and fire insurance policies (J. Evseroff Dep., Exs. 32-33; Evseroff Mem. at A-7); and there is no evidence that the Trust ever officially assumed the mortgage for the Dover Street Residence nor did the Trust claim the mortgage interest deduction between 1992 and 1998 (*see* 02/21/02 Blumer Dep., Exs. 1-7; Evseroff Mem. at A-2, A-3). Furthermore, there is no evidence that the Trust ever took any action that would have interfered with Evseroff's enjoyment of the property: his rental agreement had no set end date (J. Evseroff Dep., Ex. 12) and there is no evidence that the Trust ever contemplated selling or renting the property to anyone other than Evseroff. These facts all indicate that Evseroff retained possession and benefitted from his use and occupancy of the

Dover Street Residence much as he had when he held legal title to it. *Cf. In re Richards*, 231 B.R. at 580.

In response, Everoff argues that the Trust was not his nominee with regard to the Dover Street Residence because: (1) his status was that of a renter rather than that of an owner, as demonstrated by the fact that he paid the mortgage and upkeep costs on the property in lieu of rent;(2) he only had a license to the property, and therefore could have been evicted at any time; and (3) he did not act like an owner in that he never tried to sell the property. None of these arguments is persuasive.

With regard to Everoff's first argument, the mere fact that Everoff made some payments relating to the property does not rebut the inference that he was the *de facto* owner of the property. *See City View Trust v. Hutton*, No. 98-CV-1001-B, 1998 WL 1031525, at *10 (D. Wyo. Nov. 02, 1998). The payments Everoff made in exchange for his occupancy of the property - taxes, insurance, water and the mortgage - were precisely those that an owner of the property would make. The Trust did not claim Everoff's payments between 1992 and 1998 as income, the Trust's tax returns were prepared by Everoff's accountant and sent to Everoff rather than the Trust, and the Trust did not claim mortgage interest deductions but did claim real estate tax deductions between 1994 and 1998. *Everoff III*, 2003

WL 22872522, at *3, *11; (*see* 02/21/02 Blumer Dep. Tr. at 39, Exs.
1-7). Indeed, payment of upkeep costs for a property has been
specifically identified as a factor *favoring* a nominee finding. *In
re Richards*, 231 B.R. at 579. Thus, the inference that the Trust
was merely his nominee is a strong one.

Moreover, the payments that a renter would have made on
the Dover Street Residence would have differed greatly from those
that Evseroff made. Although Evseroff made mortgage payments for
about five years after the inception of the purported lease, after
that he was only responsible for the property's upkeep and expenses.
(Tr. at 91-93; J. Evseroff Ex. 12.) Therefore, after the mortgage
was paid off, the Trust received no net return on the Dover Street
Residence. Were the Trust truly the owner, it would have sought to
receive market rental rates, which would likely have exceeded the
mere cost of maintaining the property. Furthermore, even for the
term where Evseroff was paying for both the mortgage and the upkeep
of the property, those combined payments were still low in comparison
to the property's fair market value in 1992 of $515,000.

Evseroff's argument that he was merely a licensee who could
have been evicted from the property at any time fares no better.
According to Evseroff, because the agreement allowing him to live
in the Dover Street Residence did not contain an end date, it did

not constitute a lease under New York law. (Evseroff Mem. at 9.) Instead, Evseroff contends that the agreement was a mere license, revocable at any time. (*Id.*)

Even assuming that Evseroff is correct regarding the legal status of the agreement, it would provide little support for his argument that he did not exercise active control over the property. Given Evseroff's control over the Trust, *see infra* Part III, there was no realistic prospect that his possession and enjoyment of the Dover Street Residence would be challenged. A merely theoretical possibility that the transferor could be evicted does nothing to rebut a nominee finding. *See City View Trust*, 1998 WL 1031525, at *10.

Finally, Evseroff's argument that he did not act like an owner in that he never tried to sell the property and never attempted to use it as collateral for a loan is not enough to avoid a nominee finding given the evidence discussed above. *See Evseroff*, 270 F. App'x at 78 (citing *LiButti v. United States*, 107 F.3d 110, 119 (2d Cir. 1997)). Many property owners neither use their property as collateral (apart from their mortgage) nor attempt to sell their property. Thus, the fact that Evseroff has not attempted to sell the Dover Street Residence and has not pledged it as collateral does little to refute that he was acting as the *de facto* owner of the

property.  Accordingly, the Trust plainly holds the Dover Street Residence as Evseroff's nominee and the United States may therefore recover against the Dover Street Residence under a nominee theory.

The government, however, has not shown that the Trust holds the $220,000 as Evseroff's nominee.  Indeed, only a few thousand dollars have ever been distributed by the Trust, and that money went towards paying taxes owed by the Trust, namely, income taxes on interest earned by the Trust and real estate taxes in specific years for the Dover Street Residence.  (*See* Tr. at 61; J. Evseroff Dep. Tr. at 126-27; 02/21/02 Blumer Dep., Exs. 1-7.)  There is no evidence that those funds were distributed at Evseroff's direction.  And even if they were, the distribution benefitted the Trust significantly more than it benefitted Evseroff.[17]

---

[17] The government argues that the distribution to pay the real estate taxes for the Dover Street Residence benefitted Evseroff because he had a contractual duty to the Trust to pay those taxes.  The government, however, ignores the fact that the distribution also benefitted the Trust.  The Trust, as owner of the property, had an independent duty to pay taxes on the residence.  N.Y. Real Prop. Tax Law § 926(1) ("The owner of real property . . . shall be personally liable for the taxes levied thereon."); *id.* § 304(2) (Although a renter may have an interest in the real property that makes the renter subject to personal tax liability, "[n]othing in this subdivision shall relieve the owner of real property from the obligation for paying all taxes due on the real property under his ownership or vitiate the sale of said real property for unpaid taxes or special ad valorem levies.").  Therefore, the fact that the Trust distributed Trust funds to pay taxes for the Dover Street Residence does not provide sufficient evidence to prove that the funds were being used to benefit Evseroff, and not the Trust.

The overall objective of the nominee analysis is to determine whether the debtor retained the practical benefits of ownership while transferring legal title. *See In re Richards*, 231 B.R. at 578. The most important factors in the nominee analysis center on the transferor retaining possession of the property and deriving benefits from it. *See id.* at 579. Given that the money held by the Trust has remained substantially unused by Evseroff, he has neither retained possession nor derived benefit from the funds.

The government responds by emphasizing Evseroff's control over the funds. According to the government, the fact that the Trust's cash has remained undistributed demonstrates Evseroff's control of the funds because Evseroff did not want the funds to be distributed. (Gov't Mem. at 4 (citing Tr. at 61; J. Evseroff Dep. Tr. at 126-27).) The fact that the Trust's retention of the funds was consistent with Evseroff's wishes, however, is of minimal evidentiary value without some evidence that Evseroff controlled the funds by actions intended to ensure that the Trust funds would not be distributed. In that regard, there is no evidence that Evseroff intervened to prevent any disbursements that would have been made if the Trust really were the owner of the $220,000. Absent any evidence that Evseroff actively tried to control the Trust funds,

the government has failed to prove by a preponderance of the evidence that Evseroff was a nominee of the funds.

III.      **Alter Ego**

Finally, the government argues that it should be able to reach the assets held in the Trust because the Trust is Evseroff's alter ego.

The alter ego doctrine arose from the law of corporations and allows a creditor to disregard the corporate form (also known as "piercing the corporate veil") either by using an owner's assets to satisfy a corporation's debt or by using the corporation's assets to satisfy the individual's debt. *See State v. Easton*, 647 N.Y.S.2d 904, 908-09 (N.Y. Sup. Ct. Albany Cnty. 1995). The essence of the alter ego theory is that the entity in question really has no separate existence - it is merely a tool of someone or something else. *See Bridgestone/Firestone v. Recovery Credit Servs.*, 98 F.3d 13, 17-18 (2d Cir. 1996).[18]

---

[18] As with the nominee issue, the parties dispute whether the government must prove that the Trust was Evseroff's alter ego by a preponderance of the evidence or clear and convincing evidence. Because I find that the government's proof satisfies either standard, I need not resolve this dispute.

Although the New York Court of Appeals has never held that the alter ego theory may be applied to reach assets held in a trust, *In re Vebeliunas*, 332 F.3d at 90-91; *Winchester Global Trust Co. v. Donovan*, 880 N.Y.S.2d 877 (Table), 2009 WL 294685, at *9-10 (N.Y. Sup. Ct. Nassau Cnty. Feb. 4, 2009) (noting the lack of precedent but finding that veil piercing applies to trusts), there is no policy reason why veil piercing would apply only to corporations but not to trusts. The policy behind corporate veil piercing is to prevent a debtor from using the corporate legal form to unjustly avoid liability. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers S. Inc.*, 933 F.2d 131, 138 (2d Cir. 1991). That policy applies equally to trusts. *Cf. Winchester Global Trust*, 2009 WL 294685, at *9-10. Moreover, there is some precedent indicating that the alter ego doctrine also applies to trusts. *See Evseroff*, 270 F. Appx. at 77-78; *see also Dean*, 987 F. Supp. at 1165; *Katz v. Alpert*, 919 N.Y.S.2d 148, 148 (N.Y. App. Div. 1st Dep't 2011); *Winchester Global Trust*, 2009 WL 294685, at *9-10. Accordingly, for the reasons below, the alter ego theory will be applied to the Trust.

To pierce the veil in New York, a plaintiff must show that "(1) the owner exercised such control that the corporation has become a mere instrumentality of the owner, who is the real actor; (2) the owner used this control to commit a fraud or 'other wrong'; and (3)

the fraud or wrong results in an unjust loss or injury to the plaintiff." *In re Vebeliunas*, 332 F.3d at 91-92 (citations omitted); *see also Wm. Passalacqua Builders*, 933 F.2d at 138 (noting that the alter ego theory and the three factor test discussed above "are indistinguishable . . . and should be treated as interchangeable" (citation omitted)).

With regard to the question of Evseroff's control over the Trust, the relevant factors can be drawn by analogy from the corporate context.  In analyzing the alter ego question as it relates to a corporation, courts consider factors such as "the absence of . . . formalities . . . , the amount of business discretion displayed by the allegedly dominated corporation . . . , whether the related corporations deal with the dominated corporation at arms length . . . [and] whether the corporation in question had property that was used by other of the corporations as if it were its own." *In re Vebeliunas*, 332 F.3d at 91 n.3 (citation omitted).  Though these factors require adaptation as applied to a trust, they nonetheless provide some guidance in determining the issue of control.  In particular, they indicate that it is necessary to examine whether the Trust's formalities were observed, whether the Trust exercised its own discretion and made its own decisions as an entity, and

whether it dealt with Everoff at arms length or whether Everoff effectively controlled the Trust's property.

These factors all indicate that Everoff dominated the Trust. Trust formalities were so poorly observed as to give rise to an inference that the Trust was not a bona fide entity. To be sure, a trust instrument was prepared, tax returns were filed on behalf of the Trust, and trustees were appointed. The Trust, however, did not book the payments Everoff made in lieu of rent as income between 1992 and 1998 on its tax returns. (*See* 02/21/02 Blumer Dep., Exs. 1-7.) The Trust never officially assumed the mortgage for the Dover Street Residence. (*See* Gov't Mem. at 3; Everoff Mem. at A-2, A-3.) Thus, the Trust did not claim the mortgage interest deduction for the Dover Street Residence between 1992 and 1998 - although it did claim the deduction for real estate taxes between 1994 and 1998. (*See* 02/21/02 Blumer Dep., Exs. 1-7.) Instead, Everoff paid the mortgage interest and, for some years, paid real estate taxes and claimed the deductions. (Tr. at 50-51; *see* Gov't Mem. at 3, 5.) Everoff remained the named beneficiary of the flood and fire insurance policies on the Dover Street Residence. (J. Everoff Dep., Exs. 32-33; Everoff Mem. at A-7.) Finally, Everoff's accountant prepared the Trust's tax returns as a professional courtesy to Everoff, spent only half an hour to

prepare them, and sent the Trust returns to Evseroff rather than the trustees. *Evseroff III*, 2003 WL 22872522, at *3, *11; (02/21/02 Blumer Dep. Tr. at 36-39). All of the above evidence demonstrates both that there was little substance to the Trust and that it was merely an extension of Evseroff.

The manner in which the Trust was managed also demonstrates that it was merely an extension of Evseroff. Though trustees were appointed, there is little evidence that they played an active role in making decisions for the Trust. One apparently believed that he had no Trust responsibilities until Evseroff's death. (Schneider Dep. Tr. at 20.)

Having trustees play an active role in managing the trust is an important factor in deciding whether to respect the form of a trust. *See Dean*, 987 F. Supp. at 1165. Moreover, active involvement of trustees of the sort that would support the separate existence of a trust looks very different than the minimal

involvement present here.  *See id.*[19]  Accordingly, the trustees'
lack of substantial control over the Trust is an important point in
favor of the government.

Similarly, Evseroff also evinced his domination of the
Trust by controlling its property to a high degree.  As discussed
*supra* Part II, Evseroff acted as the owner of the Dover Street
Residence.  He made the same payments that an owner would make and
had a similar degree of practical control over and enjoyment of the
property as an owner would have.  Although Evseroff's domination of
the $220,000 in the Trust appears to have been more limited, *see supra*
Part II, that fact does not undermine the significant countervailing
evidence that Evseroff dominated the Trust.  In 1992, when Evseroff
transferred the assets into the Trust, the Dover Street Residence
was worth approximately $515,000, making it by far the Trust's most

---

[19] The *Dean* court respected the legal form of a trust as established
by two parents for the benefit of their children against IRS collection efforts
when, among other things:

> [O]ther than a brief period . . . , the trustees executed
> all documents requiring signatures by the owner of the
> trust property.  Tax returns were executed by the
> trustee.  Checks were signed by the trustees.  The
> trustees decided how to spend trust assets, when to make
> repairs on the rental property, and the rent to be paid
> by tenants.  The trustees borrowed and repaid money in
> the name of the trust.  In other words, the legal control
> of the trust assets has consistently been exercised by
> the trustee, not the taxpayer.

*Dean*, 987 F. Supp at 1165.

valuable asset.  Evseroff's control over the Dover Street Residence establishes a high degree of dominance over Trust property, further evincing his dominance over the Trust.  Thus, it is clear that Evseroff had the requisite degree of control over the Trust to support an alter ego finding.

Because Evseroff controlled the Trust, it is necessary to determine whether he used that control to commit a fraud or wrong against the government, and whether that wrong resulted in an unjust loss.  *In re Vebeliunas*, 332 F.3d at 91-92.  On the facts presented here, these elements are plainly satisfied.  As noted above, Evseroff essentially used the Trust to shield his assets from attack by those with potential claims upon them, including the government.  Moreover, given the potential claims on Evseroff's assets, and his demonstrated ability to shield his liquid assets from collection through a series of transfers, *see Evseroff V*, 2006 WL 2792750, at *3, Evseroff's use of the Trust undoubtedly caused damage to the government by hindering its collection of taxes.  Indeed, the government's continuing difficulties collecting Evseroff's taxes are evidence of the damage caused.

As a result, the government may collect against all assets held by the Trust.  The essence of the alter ego theory is that the existence of the Trust as a separate entity is a fiction - in fact

the Trust is Everoff.  *See Claudio v. United States*, 907 F. Supp. 581, 587-88 (E.D.N.Y. 1995) ("'The courts will look beyond the fiction of corporate entity and hold two corporations to constitute a single unit in legal contemplation, where one is so related to, or organized, or controlled by, the other as to be its mere agent, instrumentality, or alter ego.'" (citation omitted)); *see also Austin Powder Co. v. McCullough*, 628 N.Y.S.2d 855, 857 (N.Y. App. Div. 3d Dep't 1995) (noting that where an "alter ego" finding is made "the corporate form may be disregarded to achieve an equitable result").  Based on the court's determination that the Trust is but an alter ego of Everoff, its assets should be subject to collection just as if they were held by Everoff.  Moreover, there appears to be no reason why it would be inequitable for the government to collect on all assets held by the Trust on the facts of this case. Accordingly, all of the Trust's assets are subject to collection.

## CONCLUSION

For the foregoing reasons, the government may proceed to collect against all assets held by the Trust established by Everoff.

The Clerk of the Court is respectfully requested to enter judgment in favor of the United States and to close the case.

**So ordered.**

Dated:     Brooklyn, New York
           April 30, 2012

                              _____/s/_____
                              Kiyo A. Matsumoto
                              United States District Judge